WM. CHANCELY, plaintiff in error, *vs.* ROBERT H. BAILEY, maker, and WM. C. CLEVELAND, security, defendants in error.

Where it appeared on the face of a promissory note that it was given by defendants to the plaintiff, in consideration of the services of such plaintiff, as a substitute as a soldier in the Confederate army, to fight and bear arms against the Government of the United States.
*Held :* That the consideration of the note was illegal and void.

HARRIS, J., dissenting.

Complaint. Nonsuit. Decided by Judge COLE. Monroe Superior Court. August term, 1867.

This was complaint on the following writing :

."$2,500 00."
One day after date I promise to pay William Chancely, or bearer, Twenty-five Hundred Dollars, for services as a substitute for me, provided he serves and releases me from service for the period of three years, or during the war now going on between the Confederate States and the United States of America. And if I am not released from service for the above stated time, he is to receive only for the time he serves for me, at the rates of twenty-five hundred dollars for three years or the war.

ROB'T H. BAILEY,

January 31st, 1863.         W. C. CLEVELAND, Security.

The pleas were that the undertaking was only conditional, and payable in the currency of that time, which had been tendered and refused, and that the undertaking was illegal and void.

Plaintiff introduced the obligation in evidence and closed.

Defendant moved for a nonsuit, upon the ground that the contract was illegal and void. The Court so held, and granted the nonsuit.

It is said this was error. The cause was argued at December term, 1867, and held up for consideration.

CABANISS & PEEPLES, for plaintiff in error.

A. D. HAMMOND, by the Reporter, for defendants in error.

Chancely *vs.* Bailey and Cleveland.

WARNER, C. J.

This was an action brought by the plaintiff against the defendants upon a note, or obligation, whereby, the defendants promised, one day after date, to pay the plaintiff twenty-five hundred dollars, as a substitute for one of the defendants in the Confederate army, for the term of three years, or during the war now going on between the Confederate States and the United States of America, dated 31st January, 1863. Upon the trial of the case, the Court below decided that the undertaking of the defendants was illegal and void, and nonsuited the plaintiff. This decision of the Court below, is now assigned for error here.

The argument of the counsel for the plaintiff in error, is based mainly upon the ground that the State of Georgia had the *lawful* right to secede from the Union in 1861, and having done so, it was *lawful* for her people to form a new government, and to make war upon the Government of the United States, and, therefore, the consideration for which the note in question was given, was a *lawful* and valid consideration. This is a *judicial*, and not a *political*, question, depending for its solution upon the *legal* right of the State to secede from the American Union, and then to make war upon the Government of the United States. This Court has nothing to do with the maintainance of mere abstract *political theories*. Did the State of Georgia have the *legal* right to secede from the American Union, according to a fair *legal* interpretation of the Constitution of the United States, to which she was one of the original parties? The first, and only Union formed by the sovereign independent States of America, was formed on the 9th day of July, 1778, under the name and style of "The United States of America," by articles of confederation and *perpetual* Union between the States. This Union, so formed, was declared to be, by the 13th article of the confederation of the United States, *perpetual*. In pursuance of a resolution adopted by the continental Congress, on the 21st February, 1787, a Convention

was called of the several States, to be held at Philadelphia, "for the sole and express purpose of *revising* the articles of confederation, and reporting to Congress and the *several Legislatures*, such alterations and provisions therein, as shall, when agreed to in Congress, and *confirmed by the States*, render the Federal Constitution adequate to the exigencies of government, and *the preservation of the Union.*" The object of calling the Convention, it will be perceived, was not to form a. *new* Union, but for the preservation of the Union which had been already formed, and declared to be *perpetual.* The several States composing " The United States of America" assembled in convention at Philadelphia, and on the 17th day of September, 1787, adopted the Constitution of the United States, as the fundamental law of the government, which was subsequently ratified by the people of each State, separately, in their sovereign capacity as States, and thus became the supreme law of the land, in accordance with the terms and provisions thereof. We have already seen that the Union formed between the United States of America, in 1778, was to be a *perpetual* Union. The people of each State, therefore, acting in their sovereign capacity, declare, in the most solemn form, in the preamble to the Constitution, that " We the people *of the United States*, in order to form a *more perfect Union*, and secure the blessings of liberty to ourselves and our *posterity*, do ordain and establish this Constitution, for the United States of America." The evidence would seem to be incontrovertible that the Union of the States, under the Constitution, was intended by the framers thereof, and the several States ratifying it, to be *perpetual.* The object is expressly declared to be, on the face of the instrument, to form a *more perfect Union* than that which already existed, and that Union, as we have seen, was declared to be *perpetual.* The object and intention of the framers of the Constitution was to *revise* the articles of confederation, by which the first Union was formed, that it might remain *indissoluble forever*, for the benefit of themselves and their *posterity.* The Constitution itself, as well as the declared object of its adop-

Chancely *vs.* Bailey and Cleveland.

tion, expressly *negatives* the *legal* right of separate State se-session.

But it is said some of the States, before, and at the time of ratifying the Constitution, declared that the right of secession was *reserved* to the State. Be that as it may, the reply to that argument is, that no such reservation was incorporated into the Constitution, no terms of that or like character, are to be found in the instrument which they solemnly signed and ratified. All that may have been said, declared or resolved by the States as to the *extent* to which they intended to be bound, or as to the rights reserved, unless incorporated into the instrument which they signed and ratified, cannot now be considered in the legal construction of the Constitution. That instrument must be interpreted in accordance with the terms and stipulations contained *therein*. If the States did not intend to be bound by the Constitution as *it is*, then they ought not to have signed and ratified it; but having done so, they are *legally* bound by its terms and stipulations.

Another argument advanced in favor of separate State secession is, that the Constitution was formed and ratified by sovereign, independent States; that that being so, each State has the legal right to judge for herself when the compact has been broken, and to resume the exercise of her inherent sovereignty when, in her judgment, she thinks proper to do so; that between sovereign, independent States there is no common arbiter to judge. To the common understanding of mankind, it is extremely difficult to perceive why a sovereign, independent State should not be bound by her *voluntary* engagements in the same manner as individuals, and be required to perform them. Vattel, in speaking of the sovereignty of States, (an authority with which the framers of the Constitution were obviously familiar,) declares that "several sovereign and independent States may unite themselves together by a *perpetual* confederacy, without ceasing to be each individually a perfect State. They will, together, constitute a Federal Republic; their joint deliberations will not impair the sovereignty of each member, though they may, in certain respects,

put some *restraint* on the exercise of it, in virtue of *voluntary* engagements. A person does not cease to be free and independent when he is obliged to fulfill engagements which he has *voluntarily* contracted." Vattel, page 3, chapter 1st, section 9. Concluding, then, that the several States were sovereign and independent at the time of the adoption of the Federal Constitution, they were *able* and *willing* to bind themselves together in a *perpetual* Union, for the purpose of establishing a government, and *voluntarily* entered into a solemnly *executed* compact for that purpose, and the Constitution is the legal evidence of that *executed* compact. Whatever powers, therefore, these sovereign, independent States *voluntarily* granted to the Federal government which they organized and created—whatever restraints they *voluntarily* imposed upon themselves as to the exercise of their respective attributes of sovereignty, as manifested by the Constitution— they are *irrevocably* bound thereby; for, in the language of Mr. Justice Story, in Martin ᵛs. Hunter's lessee, (1 Wheaton's R., 304,) " the Constitution was not intended to provide merely for the exigencies of a few years, but was to endure through a *long lapse of ages,* the events of which were locked up in the inscrutable purposes of Providence." An *executed compact* differs in nothing from a *grant.* 2 Bl. Com., 443. A grant, in its own nature, amounts to an *extinguishment of the right of the grantor,* and implies a contract *not to reassert that right*; a party is, therefore, . always *estopped* by his own grant, although that party be a *sovereign State.* Fletcher vs. Peck, 6 Cranch's R., 308.

But if we concede, *ex gratia,* that one State has the legal right, by virtue of her inherent sovereignty, to judge for herself that the *executed* compact into which she *voluntarily* entered, has been broken, and adopts her own mode and means of redress, still, it must also be conceded that every other State in the Union has precisely the same right, by virtue of her inherent sovereignty, to judge for herself, that the *executed* compact has *not been broken,* and the result would be a resort to force to decide that question, which would necessarily defeat the declared object and intention of the people of the respect-

ive States in the formation of the government of the United States. The framers of the Constitution, however, (with that consummate wisdom and *practical* statesmanship which so eminently qualified them for the work which they performed,) have made ample provision in the Constitution for the arbitrament of all such controversies and disputes. The States themselves, by their own *voluntarily executed* compact, created the Supreme Court of the United States and declared that it should be the *peaceful* arbiter to settle all controversies arising between the respective States; the States, by their solemn, *executed* compact, *voluntarily renounced the right* to judge for themselves as between each other, and the decision of their own chosen arbitrator, upon a proper case being made, is binding upon them. The argument, therefore, that there is no common judge to settle and determine controversies between sovereign, independent States, and that they have the right to judge for themselves, has no legal foundation or support, when attempted to be made applicable to the States of the American Union, for the reason that they, by their own *voluntary* engagements, have expressly stipulated, in the Constitution, that all controversies between them shall be determined by a tribunal of their own creation and selection, which excludes all pretension that they may *lawfully* do it for themselves.

This view of the question is in strict accordance with the general principles of the law by which civil society is governed. Vattel states the rule to be, " that if any disputes arise in a State respecting the *fundamental* laws; the public administration, or *the rights of the different powers of which it is composed*, it belongs to the nation alone to judge and determine them, conformably to its *political constitution*." Vattel 12, section 36. Conformably to the political Constitution of the United States, the Supreme Court is made the chosen arbiter, to judge and determine the disputes and controversies that may arise between the respective States, of which the Government of the United States is composed, and not each State in her *individual capacity*. This is no impeachment of the sovereignty of the States, but is in strict

accordance with their own *voluntary executed compact*, as expressly declared in the Constitution, in order to perfect and promote the *practical* operations of that government which they created and established for the benefit of themselves and their posterity.    The ultimate political sovereignty of the government created by the Federal Constitution, resides in *the United States of America*.    That government was not formed by *the people of the American Union*, nor does it purport, on the face of the 'Constitution, to have been so formed, but on the contrary, it purports to have been formed by, " we, the people of *the United States*," and not by " we, the people of *the American Union*."    The Constitution was formed, and the Federal Government created by the people of the respective States, acting in their sovereign capacity as distinct and separate political organizations.    When the Constitution was adopted and ratified by the people of the respective States, in their sovereign capacity as States, they did not empty themselves of any portion of their political sovereignty, or make any *specific* division of it.    Sovereignty is *indivisible* and *unalienable*.    Vattel 27, 31, sections 65 and 69.    They formed a government, however, by their solemn *executed* compact, adequate to the wants and necessities of the people of the respective States, provided all the necessary political and judicial machinery, so as to make it a *practical* working government, to endure throughout all time.    The several States, by their *voluntary executed compact*, expressly stipulated that the Federal Government which they created, its officers and agents, should exercise certain enumerated attributes of sovereignty *in their joint names*, and solemnly stipulated that *they would not*, either expressly or by necessary implication.    The powers granted to the Federal Government, by the States, as expressed in the Constitution, were intended to be a *consolidation* of power in that government, to *that extent*, intended to vest in that government, the supreme, irresistible, absolute, uncontrolled authority over the people of the respective States, so as to act efficiently and directly upon them as individuals, and as a *unit* in the execution of those *granted powers*.    It must be conceded,

therefore, that the Federal Government, to the *extent of the powers granted to it by the States*, in the Constitution, is, in the language of Washington, a *consolidated* government, and that the primary object was a consolidation of the Union, at least to *that extent*. See Washington's letter transmitting the Federal Constitution to the Continental Congress. The powers *not granted* to the government of the United States by the Constitution, nor *prohibited* by it to the States, are expressly reserved to the States, or to the people thereof, and a State, in the language of the Supreme Court, in the case of the city of New York vs. Miller, (11th Peter's Rep., 139,) " has the same undeniable and unlimited jurisdiction over all persons and things within its territorial jurisdiction as any foreign nation, where that jurisdiction is not *surrendered* or *restrained* by the Constitution of the United States." Thus it is apparent, that whatever powers were *granted* by the voluntary *executed* compact of the sovereign States to the Federal Government, to be exercised in *their joint names* for the preservation and consolidation of the Union, as therein expressed, binding upon them to *that extent* and *no more*. "In England, the sovereign power, *quoad hoc*, is vested in the person of the King. Whatever contracts, therefore, he engages in, no other person in the kingdom can legally resist or annul." 1st Bl. Com., 257. The sovereign power of the State of Georgia, at the time of the adoption and ratification of the Federal Constitution, was vested in the people of the State, as a distinct and separate political organization. Whatever, therefore, they, in their sovereign capacity, *voluntarily* bound themselves to do or not to do, by the terms and stipulations contained in the Constitution of the United States, they could not afterwards *legally* delay, resist, or annul, by separate State secession from the Union; they were inviolably bound in law, by their solemn *executed* compact; for we have already shown that their declared object was to form a *more perfect Union* of the States, which Union was then already declared to be *perpetual*.

We have previously stated that the ultimate political sovereignty of the Federal Government resides in *the United*

*States of America.* The truth of this proposition may be illustrated by reference to the contemporaneous history of that Government from the day of its organization up to the present time. "Sovereignty (says Vattel) is that public authority which *commands* in civil society, and orders and directs what each citizen is to perform to obtain the end of its institution." Vattel, page 12, section 34. All the laws of the Federal Congress are enacted in the name of *the United States,* where the political sovereignty resides. All orders of the Federal Government are issued in the name of *the United States,* where the political sovereignty of the government resides. Treason is an offence committed against the *political sovereignty* of the government. The Federal Constitution declares that treason " shall consist only in levying war against *the United States,* or in adhering to their enemies, giving them aid and comfort." The process and mandates of the Federal Courts issue in the name of *the United States,* where the political sovereignty resides. The flag of the Union is an emblem of sovereignty, but it was not designed with *one star,* as representing the sovereignty of the Federal Geovrnment, or as representing the sovereignty of the entire people of the American Union, but it was designed with *thirteen stars,* thereby. intending to represent the sovereignty of the *thirteen United States,* and wherever that flag floats, on the land or the sea, it is an emblem of *the sovereignty of the United States of America,* where the ultimate political sovereignty of the Federal Government resides. By the 6th article of the Constitution of the United States, it is declared that "this Constitution, and the laws of the United States which shall be made *in pursuance thereof,* and all treaties made, or which shall be made, under the authority of *the United States,* shall be *the supreme law of the land,* and the Judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." Why is the Constitution, and laws of the United States made *in pursuance thereof,* the supreme law of the land ? Because the several States of the Union, acting in their sovereign capacity, by their voluntary *executed* compact, have declared that they shall be so, in order

Chancely *vs.* Bailey and Cleveland.

to form a more perfect Union, etc.   Why are the citizens of
Georgia bound to observe and obey the Constitution and laws
of the United States, made *in pursuance thereof*, as the su-
preme law of the land ?   Because the State, acting in her
sovereign capacity, has *commanded* them to do so, in the Con-
stitution of the United States, in order to form a *more perfect
Union*, etc.   The *mandate of the States* is not any the *less po-
tent* or *imperative* because it is embodied in the Constitution
of the United States.   All the powers granted by the States
to the Federal Government in the Constitution, are to be ex-
ercised by that government, and are made obligatory upon the
citizens of every State, by the voluntary, *executed* compact of
the States, acting in their sovereign capacity as such, in order,
as they declared, to form a *more perfect Union* than that
which then existed by the articles of confederation, which
was declared therein to be a *perpetual* Union.   It is an un-
deniable fact, that the political sovereignty of each of the
States, at the time of the formation of the Constitution, re-
sided in the people thereof, and that the Federal Government,
from the time of its organization under the present Consti-
tution, has been operated and conducted in the name of that
sovereign authority, to-wit : "The United States of Ameri-
ca."   The several States, when they assembled in conven-
tion to form the Constitution, had two leading objects in view.
First, to preserve the Union of the States.   Second, to form
a Federal Constitution, adequate to the exigencies of govern-
ment.   The result of their labors is to be found in the Con-
stitution of the United States.   The several States, by their
voluntary, *executed* compact, created the Federal Government
and granted such powers to it as in their judgment would be
adequate to the exigencies of good government.   The Con-
stitution, so formed, was submitted to a convention of dele-
gates chosen in each State by the people thereof, was ratified
by them, as separate and distinct political organizations, and
thus became the supreme law of the land.

The State of Georgia, then, ever since the adoption and
ratification of the Federal Constitution, has, and does now,
constitute an *integral part of the political sovereignty* of the

government of the United States of America. She became so by her own *voluntary, executed, irrevocable compact,* for the express purpose of forming a *more perfect Union* of the States than that which already existed; to establish justice, insure domestic tranquility, provide for the common defence, promote the general welfare and secure the blessings of liberty to her people and *their posterity.* By no act of her people, therefore, could she *lawfully* reassert and resume *the powers thus granted, and thereby* destroy the *unity* of that government of which she constituted an *integral part,* except by *succesful revolution,* which has not been accomplished. It is to be regretted that the political heresy of *peacable* State secession from the Union, as being *practically* different from revolution, should ever have found a lodgment in the minds of our people. It finds no legal support either in the Federal Constitution or in the decisions of the Supreme Court of the United States, the recognized interpreter and expounder of that instrument.

The result and logical conclusion, therefore, is that the plaintiff in error, when he made the contract sued on, to serve as a substitute in a war against the government of the United States of America, of which government the State of Georgia constituted an *integral part,* violated the supreme, paramount law of the land, and the contract is, therefore, null and void. Allegiance is the tie or ligament which binds the citizen to the government in return for the protection which the government affords him. The paramount allegiance of the plaintiff, as a citizen of Georgia, was due to that government which she, in her sovereign capacity, had *commanded* him to obey as the supreme law of the land, and *her mandate* is to be found in the Constitution of the United States, which declares that that Constitution, and the laws of the United States made in pursuance thereof, *shall be the supreme law of the land,* anything in the Constitution or laws of any State to the contrary notwithstanding. The plaintiff contracted to engage in a *war against the United States.* The State of Georgia, in her sovereign capacity, has *commanded* him, as well as all of her citizens, in the Constitution of the United States, to observe that

Chancely *vs.* Bailey and Cleveland.

" treason against the United States shall consist only in *levying war against them*, or in adhering to their enemies, giving them aid and comfort." These *mandates* made to the citizens of the State, by her sovereign authority, are not any the *less binding* upon them because the same are embodied in the Constitution of the United States. It is the voice of *their sovereign*, speaking as an *integral part* of the sovereignty of the government of the United States, in the most authoritative and solémn form, and in the language of her own *voluntary, executed compact*, which all are bound to obey as *the supreme law of the land*, for the simple reason that the State, in her sovereign capacity, in common with the other States which formed and ratified the Federal Constitution, has *commanded* them to do so. It is, therefore, the judgment of the majority of the Court that the judgment of the Court below be affirmed.

NOTE.—WALKER, J., concurred in the judgments in the two foregoing causes, but wrote out no opinion.

HARRIS, J., dissenting in this and the foregoing cause.

It is not within the narrow confines of municipal law that we are to look for the principles upon which a correct decision of the questions presented by the record in the above causes can be made. They are to be collected from the vast field of international law, and especially that portion of it occupied by *war*.

The resolution of *the legality of the confiscation and sale* of the Railroad shares in the first case, and in the other of *the legality of the consideration* of the promissory note given for the services of the plaintiff in error as a substitute in the ranks of the Confederate army for one of the promisors, *can depend*, in my opinion, *only on two propositions.* If either of those propositions be true, the judgment of the majority of this Court cannot for a moment, be supported. .

Those propositions are:

1st. If the States which withdrew from the Federal Union and formed afterwards the Southern Confederacy, were *sov-*

ereign or perfect States at that time, as such States, they had a right to engage in public war with those States which continued in the Federal Union; or,

2d. If the States attempting to withdraw from the Federal Union, formed the de facto government called the Southern Confederacy, and engaged in war with those which did not attempt to withdraw, and that war was recognized by the Federal Government as a civil war and the Southern Confederacy as a belligerent power, then from such recognition, the Southern Confederacy was ·invested with all the belligerent rights and powers which belong undeniably to sovereign States or nations engaged in public war, or in other words, the question is, whether the war between the States was a public or a civil war.

If the view that I have taken of our systems of government be founded in fact, (and I think it is confirmed by all American history,) it must be conceded by all who reason, that when the Federal Constitution of 1789 was adopted by the conventions of the separate States then ratifying it, they were each sovereign and independent States, with an unquestionable right either to agree to or reject it. If they were then sovereign and independent States, and could not have been coerced by their associates under the articles of confederation, to agree to the more perfect union of the Federal Constitution, the important enquiry arises and demands a definite answer—when and by what instrument was their sovereign and separate existences as States lost or surrendered? That sovereign powers, which were witheld by the States from the Confederate Congress, which preceded the adoption of the Federal Constitution, were by the latter instrument, delegated to the departments of government under it, for the exercise of those powers for the benefit of the States thus united, is undeniable, but upon the authority of what publicist can such delegation to a common agent of such sovereign powers be held to be a surrender of sovereignty?

A complete answer to those who say that sovereign character of the States was surrendered by the creation of the

Chancely *vs.* Bailey and Cleveland.

Federal Government, will be found in the following extract from Vattel: "Finally, sovereign or independent States may unite themselves together by a *perpetual confederacy without ceasing to be each individually a perfect State;* they will together constitute a Federal Republic; their joint deliberations will not impair the sovereignty of each member, though they may in certain respects, put some restraint on the exercise of it in virtue of their voluntary engagements. A person does not cease to be free and independent when he is obliged to fulfil engagements which he has voluntarily contracted." The latter portion of this extract is conclusive that the States adopting the Federal Constitution did not cease to be free and independent, because they entered into covenants with each other, and could in consequence thereof, be compelled to fulfill the engagements which they had voluntarily contracted. Thus it is apparent that the *obligation to fulfill covenants* made by a sovereign or perfect State is entirely compatible with continuing sovereignty and independence. I may go a step further and concede that those States who suffer by a breach of such covenants, may, as in all cases of leagues, conventions, compacts and treatise, (for in principle, they stand precisely on the same footing,) redress themselves as sovereign and independent States can do; but because such rights of redress have attached, *they can in no wise effect* the character of the States, breaking their covenants *as States.* Let it be borne constantly in mind, that that *character* remains *unaltered* and *unalterable* by any violation of their covenants. There is no fact more indisputable than that, if any prominent advocate of the Federal Constitution had in any one of the State Conventions, either directly or indirectly, intimated an opinion, that by the ratification of the Federal Constitution, the States surrendered their separate individuality and sovereignty as States, such was the extreme jealousy for the maintenance of State sovereignty, such an opinion, or intimation of opinion would have led to the prompt and overwhelming rejection of that instrument.

This contemporary history ought, with every man seeking to understand the structure of American Governments, to be

36

decisive of the great point, that the States were as sovereign *after the ratification of the Federal. Constitution*, as they were under the articles of confederation.

The enquiry is then, the States being *perfect States* according to Vattel, not whether they had a right to withdraw from the Federal Union or Constitutional compact *without incurring the penalties they hazarded by so doing*, but whether the power to withdraw is not a right *necessarily inherent* in *every perfect State?* If they were perfect States, they had an inherent right to alter their forms of government, and to institute new governments. Their obligation to observe the covenants of the Federal Constitution was exactly the same as that resting upon the sovereign States in their conventions, compacts and treatise with each other, the engagements being between equals, conferring rights and imposing restrictions. The reasons of justification for a breach of their engagements should be so strong as to vindicate their acts before the world of public opinion. Whether broken with, or without adequate cause, or however those engagements may have been sought to be enforced, the important fact stands out unaffected by any of these considerations, that the acts done were acts of sovereign or perfect States.

From what I have said it will appear that I assert as propositions which I think cannot successfully be controverted—

1st. That the Federal Constitution was made by the people of separate, sovereign and independent States.

2nd. That ratifying the Federal Constitution by separate State Conventions, they, by such action distinctly asserted their sovereign and independent character as States.

3d. That the Federal Constitution contains, within itself, no surrender of their individual character as States.

4th. That being *perfect* States, the Southern States, renouncing the obligations of the Federal Union, had an inherent right to form, as they did, the Southern Confederacy.

5th. That as *perfect States*, they had a right to engage in war, as other sovereign States could do.

If the proposition, then, be true, that they were *States*, then

the war in which they engaged with the other States remaining in the Federal Union, was a *public* war. If the war was a *public* war, it can admit of no doubt that in its prosecution, according to the rules and rights of war, whatever was done by them was *legal*, and is so regarded by the world.

To the States, thus making *public* war, belong the rights of raising and maintaining armies, coining money, borrowing money, using the public credit, issuing treasury notes, employing all the instrumentalities necessary or appropriate to their defence, weakening the power of the adversary, as by captures on sea or land, and also by confiscating *enemies'* property within their limits.

In Brown vs. The United States, 8 Cranch, 143, it is said that as to *enemies'* property found within the territory of a belligerant power *the right of confiscation* is fully admitted by all publicists. War is not itself, an *absolute* confiscation. It simply confers *the right to confiscate*, which right is enforced by legislation. The enemy is not *divested* of his property by war. His title remains in full vigor *until a hostile seizure and possession* has impaired his title.

Whilst the practice of declining to confiscate debts and credits, and the private property of an enemy, will be found to be the wisest and most liberal policy, and which will, in the progress of time, become the settled rule of all civilized nations, at this day, by the laws of war, the right of confiscation is *an uncontrolled power*, belonging to sovereign belligerents.

From the foregoing line of argument, it must be apparent that I entertain the opinion that the recent war between the States, was a *public* war, and that, therefore, the *actual confiscation* by the Courts of the Southern Confederacy, of the Railroad shares owned by Northern citizens, then the *enemies* of the Southern Confederacy, was authorized by the laws of war, and *that the purchasers thereof, under a sale after its condemnation, acquired a valid title*, and further, that the note given in the other case, to the substitute, to take the place of the maker in the Confederate ranks, was founded on *a legal consideration.*

Since delivering, orally, in June last, my dissentient opinion to the judgment of my associates, I have met with, and perused with care, the first volume of a work, by the Honorable Alexander H. Stephens, entitled "The War Between the States." I regret that I am precluded, by the delay which has already occurred, and the pressure to forward this opinion for publication, that I cannot make, from that great work, extracts which would support the train of thought which I have expressed. I refer, therefore, to it generally, regarding this volume as the most important contribution ever made by an American statesman, to political science. It is destined to become a high authority, and will, doubtless, be made a text-book in our colleges.

But it will probably be denied that it was a *public* war, a war between sovereign States. As it is not necessary, to the maintenance of the conclusions to which my mind has been conducted, to adhere to the position that it was a *public* war, I propose, therefore, to consider the questions in the record, as they are affected by *civil* war.

My associates, when the judgments of the majority were announced, not having preceded them by any exposition of the reasons upon which they were predicated, have left me without any means of reply, but by conjecture.

They are constrained, logically, I think, in order to maintain their judgments, *to assume* that the Southern States, in attempting to throw off the obligations of the Federal Constitution, and forming new government and waging war with the States which remained in the Federal Union, were *insurgents and rebels against the lawful sovereign authority of the United States Government, and that consequently, whatever acts were done by them in the prosecution of such insurrection, were illegal and void.*

If the late war had been marked merely by the armed resistance of *some* of the citizens of the State to its laws, or to the laws of the Federal Government, as in the cases in Massachusetts in 1789, and in Pennsylvania in 1793, it would very properly have been called an *insurrection,* and the acts of such insurgents have been held as illegal, the relations of

the States towards each other not being affected *politically* thereby, and those citizens in revolt, not having acquired the epithet and privileges of *enemies.*

But when such insurrection covers a Territory or State, and the citizens are in arms, *not by their own will,* but by the compulsory power of the State Government, such resistance assumes the proportions, and is acknowledged by the nations as *civil* war.

In the Supreme Court of the United States, in what are familiarly known as the Prize Cases—reported in 2nd Black, P. 666—it was urged in argument, that the people of the South were *insurgents,* that they were *traitors,* and, as such, could not make war. To this Justice Grier, delivering the opinion of the Court, replied : " The law of nations is called the law of nature. It is founded in the common consent, as well as the *common sense,* of the world. It contains no such anomalous doctrine as that which this Court is, for the first time, desired to pronounce, to-wit : That insurgents, who have risen in rebellion against their sovereign, expelled her Courts, established a revolutionary government, organized armies, and commenced hostilities, are not *enemies,* because they are traitors, and a war levied on the Government by traitors, in order to dismember and destroy it, is not a war, because it is an INSURRECTION."

In this extract, there are two material declarations; 1st, it was a *war,* and 2nd, that the citizens of the Southern Confederacy were the ENEMIES of the Federal Government. That war was, according to the Supreme Court of the United States, a *civil* war.

I have, before, expressed my own conviction that the war was a *public* war, as much so, indeed, as the recent war between Prussia and Austria ; but, as a tribunal, *to which this Court is bound to conform its judgment in such cases,* has decided it to have been a *civil* war, my associates are constrained, by that judgment, to ignore the idea that it was *no more than an insurrection.* They are bound to treat it as a *civil* war, *drawing after it all the consequences which flow from such recognition.* " A *civil* war," says Vattel, "breaks the bands of

society and government, or, at least, suspends their force and effect. It produces, in the nation, *two independent parties, who consider each other as enemies,* and acknowledge no common judge." The *two parties,* therefore, *must, necessarily, be considered,* at least for a time, *as constituting two separate bodies,* or *distinct societies.* Having no common superior to judge between them, *they stand in precisely the same predicament as two nations* who engage in a contest, and have recourse to arms. This being the case, it is very evident that the *common laws* of war, those maxims of moderation and honor, ought to be observed by both parties in .every *civil* war. A *civil* war is never proclaimed, *eo nomine,* against actual insurgents. Its actual existence *is a fact which a Court is bound to notice and to know.* Its true test is to be found in the fact that the regular course of justice is interrupted by revolt, rebellion or insurrection, so that the Courts of justice cannot be kept open. A *civil* war exists, *and hostilities may be prosecuted on the same footing as if those opposing the Government were foreign enemies invading the land.* Mr. Wheaton, in his treatise on the law of nations, says : " The general usage of nations regards such a war [*civil* war,] as *entitling both of the contending parties to all the rights of war against each other,* and even as respects neutral nations." Mr. Justice Nelson, in delivering the dissenting opinion of the minority, in the Prize Cases, (the Judges differed only *as to the point of time* when the United States Government recognized the existence of *civil* war,) said : " In the case of a rebellion, or a resistance of a portion of the people of a country against an established government, there is no doubt, if, in its progress and enlargement, the government thus sought to be overthrown, sees fit to recognize or declare the existence of a *civil* war, *that recognition or declaration will draw after it all the consequences and rights of war between the contending parties* AS IN THE CASE OF PUBLIC WAR."

These quotations establish, beyond dispute, that, by the laws of nations, where a *civil* war exists, *and it has been recognized* by the government claiming paramount authority, that *civil* war *stands upon the same footing, in all respects, as*

Chancely *vs.* Bailey and Cleveland.

does a *public war between independent nations,* and such recognition draws after it all the rights and consequences which belong to *public* war.   The Act of Congress of the 13th July, 1861, says Mr. Justice Nelson, *recognized* a state of *civil* war between the Federal Government and the Southern Confederacy, and made it territorial.   In the recognition·of a civil war by the Act of the 13th July, 1861, is involved, necessarily, the recognition of the Southern Confederacy as a belligerent *power,* or government *de facto* ; for they are synonymous.   Such recognition was a concession to the Southern Confederacy of the *same belligerent powers and rights* which the Federal Government claimed and could exercise. It drew after it the acknowledgment that it was a government, with all the departments necessary to the exercise of the powers and rights belonging to government, and that they were legally invested with such powers and rights as instruments or means essential to its existence.

Such belligerent *power* or *de facto* government, then, could rightfully do, in carrying on the *civil* war and maintaining its resistance, what a free and independent State could do— *the measures of right and power and means being precisely the same in both belligerents.*   It follows from this postulate, that in the administration of justice in the decision of questions before its Courts, indeed, in all matters touching its own defence or security, the acts of the several departments of a belligerent *power* or *de facto* government, are as legal and unquestionable as are those of independent nations.

It was insisted by the counsel for the Central Railroad that the Prize Cases show that nothing more was decided by them than "the existence of war, and of belligerents' rights, whilst the war continued."   If, by this, they meant to say that the Supreme Court of the United States held that it was an insurrection *only,* and did not change the relations of the States engaged, so as to make their citizens respectively *enemies* to each other, they have greatly misunderstood the extent of the principles of public law upon which these cases were decided. The Prize Cases admit "that, in organizing the rebellion, the States ACTED *as States claiming to be sovereign* ; that it

was no loose organized insurrection, having no defined boundary or possession. It had a boundary marked by lines of bayonets, and, south of this line, is *enemies'* territory, claimed and held in possession by *an organized, hostile, belligerent power.*"

·But counsel say that the belligerent rights belonged to the Southern Confederacy only *whilst* the war continued. It is certainly true, belligerent rights exist only whilst war continues, and if this truism *was all that was meant* to be asserted, it would not have challenged remark; but, if thereby it was meant to assert or *covertly insinuate*, that the conquering government could, at its will or pleasure, *retract*, when the war was ended, *what it had granted during the war*, and that it could treat as *illegal*, acts which, during the war, *were conceded to be legal*, it is a proposition so monstrous, from its *unmitigated iniquity*, as to shock the reason, and forbid its consideration. Common sense would revolt at such a pretension by a conqueror; as it would be antagonistic to those maxims of justice, honor and equality, which are supposed to regulate the relations of governments in war and in peace. Conquest gives no right to undo, what, during war, was *rightfully* done. Whatever acts were done by a belligerent *power*, in the exercise or enforcement of belligerent rights, stands *afterwards* as they stood when done—legal, unimpeachable. Any other conclusion would make the concession of belligerent rights, if not sheer nonsense, a mere mockery, a fraudulent device to lull the fears of a belligerent adversary at the time, and to acquire substantial and unequal advantages thereby, and, upon the cessation of hostilities, to reassert all the .powers and claims which had been waived.

It is not for the Federal Government, claiming sovereign rights and supremacy over the Southern Confederacy, with which it wages war to reduce the latter to obedience, to treat, after its recognition of the war as a *civil* war, the Southern States as in *insurrection*, or their citizens, who took up arms at the command of their States, as rebels or traitors. *Its jurisdiction over them has passed away* by its consent and acts. They can be treated only as *foreign enemies*, over whom the

municipal laws of the conquering government cannot be extended.    That government cannot drag the citizens of the conquered *de facto* government, *now* before its municipal tribunals, to answer to charges of treason.    If there was originally, in resorting to arms, insurrection and treason, *that Government has condoned it,* by recognizing it as *civil* war. *All its power over those in arms ceased by raising them to its level, and terming them and treating them as enemies,* and the epithets of rebels and traitors, applied to them so freely, through ignorance or malice, are as inappropriate and untrue as they are insulting and wanting in magnanimity.

It is evident, from the premises, that the Federal Government has no right, whatever, to vacate the judgments of the Prize and other Courts of the Confederate Government in sequestering or confiscating *enemies'* property within its limits, nor, in any mode, can it divest the title of a *bona fide* purchaser of such property actually confiscated, so as to restore it to the original owner unaffected by what has transpired. It should be remembered that conquest gives no right to private property not seized and appropriated as booty at the time ; and hence, the railroad shares in the hands of a *bona fide* purchaser, under judicial condemnation and sale, not having been re-seized or recaptured by the army of the Federal Government, the doctrines of the *jus postliminii* could not obtain.    Confiscated during the civil war, as *enemies'* property, and sold, and, *not having come again into the hands of the conquering government,* it is incapable of being restored to its original owner.    The claim of these original owners is against the Federal Government for compensation or indemnity for the loss they sustained.

If the reasoning employed in this opinion, or rather so much of it as flows directly from the decisions of the Prize Cases and the laws of nations, be sound, it necessarily follows that, as Ward and Owens are *bona fide* purchasers of the railroad shares which were confiscated by the laws of the Confederate Government, judicially condemned as *enemies'* property in one of her Courts, and sold by a public officer of that Government, and thereby, passed out of the posses-

sion and control of that Government, *their title, under such sale, is good against the claim of property of the original owners,* and the Central Railroad and Banking Company should be decreed to cause appropriate entries of the ownership of Ward and Owens to be made on the stock book of the corporation. It must follow also, in the other case, that the note given by Bailey and Cleveland to Chancely, for his services as a substitute for Bailey in the Confederate army, is founded on a *valid* consideration, and that judgment should have been rendered in favor of Chancely.

The termination of the *civil* war in the conquest of the Southern Confederacy as a belligerent *power*, produced consequences which the necessities of this argument do not require me to consider further than to say that, beyond all denial, the States composing it *remained as States during that war,* with perfect organizations, performing all their functions with the same regularity as they had previously to the war. Conquest dissolved the Confederate Government; but the States composing it remained. The conquest restored the authority of the Federal Government, where it had been displaced by the Confederate Government, and conferred the right only to change or alter the political laws or institutions adverse to its own, according to its policy or will; but conquest did not, could not, give to the conquering government any power over the executed and past, so as to annul that which, when done, was legal, and, by its own concession, was a right belonging to a belligerent power.

And here I may be pardoned for referring to an opinion entertained in 1865 by the highest functionary of the United States Government, as I learned it from the then provisional Governor of Georgia, viz: *That all the acts done during the civil war by the State Government were illegal,* and that, upon its termination, there was not, within the State, a single rightful functionary, of her own creation, with authority to legislate, to interpret or execute her laws.

I mention this fact, not directly within the line of the argument used to demonstrate the incorrectness of the judgment of my associates, though it springs from the same mis-

take of regarding the late war as a mere *insurrection*, common to the reasoning of all of them, but to exhibit how terrible are the errors into which men of great ability, invested with immense power, do fall, from disregarding the clear and simple principles of the public law, which I have endeavored to illustrate and apply. The existence of such a political chaos, arising from *civil* war and conquest, as is so distinctly indicated by the opinion just mentioned, it is apprehended, is without a type since the creation of man. An opinion like this might be viewed with a tolerant indulgence, if the principles of public law were unsettled, floating in the mind, vaguely apprehended, and casually drawn into application by statesmen; but when, for centuries, they have been explored in all their bearings, considered in all their force, pursued in all their consequences, and reduced to a code of definite rules, furnishing a just and common standard to which nations do appeal with confidence in the adjustment of their controversies, there should be, at this day, no excuse for ignorance or misapprehension of them. These principles, when they come in conflict with the doctrines of the common or municipal law, are paramount and controlling. I esteem them of such surpassing importance for the protection of the South against the insolence and will of those who claim unlimited power over the conquered, that, with the design of deepening their impression on the minds of those who have no other security than in them, I cannot forego the temptation of making a succinct summary of those from which my deductions have been made.

War being the force employed by a nation or State for its defence or the maintenance of its rights, whenever it acquires the character of a *civil* war, the belligerent power or *de facto* government with whom it is waged, is recognized during its continuance, for every purpose, as an independent State, with all the faculties and powers of government which belong of right to independent States. The recognition of the existence of a *civil* war was an acknowledgment that the Southern Confederacy was a belligerent power or *de facto* government; such recognition drew after it, of necessity, according to the

Chancely *vs.* Bailey and Cleveland.

law of nations, the right of this belligerent power to *prosecute* the war; this involved the power to raise and support armies, employ mercenaries, make contracts for their service, prescribe conditions of enrolment and substitution; it involved the right to command every citizen to defend the government *de facto* as far as he was able. As this duty was a legal one, as the citizen was bound to obey a power, he could neither resist or call in question, obedience to its will cannot subject him, at any time thereafter, to punishment for such obedience to the municipal laws of the government against which he has borne arms. By that government he has been recognized as a *foreign enemy.* He, then, when captured or conquered, can be dealt with by the conqueror *only as an enemy.* Again: as the belligerent power or *de facto* government has been invested with all the powers and rights of independent States engaged in public war, it follows that to it belongs all the rights and powers of government, such as coining money, borrowing money, issuing its bonds or treasury notes, using its credit, weakening the resources of its adversary, and, by legislation, prescribing how enemies' property, within its territorial limits, may be captured or seized and confiscated, and its proceeds appropriated to public uses.

I am persuaded that, if the principles of public law, determining the rights and relations of States in peace and war, and the results of conquest, were thoroughly understood and applied by the municipal Courts of the United States Government, and of the States which have been conquered, with intelligence and fidelity, the multitude of questions which now vex, and will, for years, probably, agitate our tribunals, and which, at every step, are embarrassing the interpretation and validity of contracts, could receive an easy and correct resolution.

I file this dissentient opinion under the strong conviction *that the time is not distant,* when the legal mind of this country will be found in entire unison with the views I have expressed, and then the wonder will be, that reason had ever been so demented as to deny or ignore their conclusiveness.